UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CLIFF OHLER AND KURT SCHLOTTERBECK, | ) ) ) | CV 10-09892 SVW (JCGx) |
| Plaintiffs, | ) ) | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [19] |
| v. | ) ) | [JS-6] |
| CITY OF FONTANA, a municipal corporation; ROD JONES, individually and as Chief of Police; KEN HUNT, individually and as a City Manager; NATE HARLEY, individually and as a Captain; WILLIAM MEGENNY, individually and as a Liuetenant; and ORBELIO RODRIGUEZ; individually and as a Lieutenant; and DOES 1 THROUGH 10, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

I.    **INTRODUCTION**

On December 22, 2010, Plaintiffs Cliff Ohler and Kurt Schollterbeck filed the instant action.  On February 9, 2011, Plaintiffs filed their First Amended Complaint ("FAC") alleging the following claims against Defendants the City of Fontana and/or city employees Rod Jones, Ken Hunt, Nate Harley, David Faulkner, William

Megenney, and Orbelio Rodirguez: (1) 42 U.S.C. § 1983; and (2) Gov't Code §§ 3502, 3506 & Labor Code § 1102.5 - Retaliation. (FAC ¶¶ 21-33).

Plaintiffs are police officers with the City of Fontana Police Department (the "Department") who also held leadership positions in the designated bargaining unit for sworn officers, the Fontana Police Officers Association ("FPOA"). (Plaintiff's Statement of Genuine Issues, hereinafter "PSGI" ¶ 3). Plaintiffs allege that, in 2010, Defendants engaged in First Amendment Retaliation by taking actions designed to prevent Plaintiffs from securing promotions to the rank of Sergeant in retaliation for various disclosures Plaintiffs made during 2007 and 2008 in their capacity as FPOA representatives. (FAC ¶¶ 9-20). On August 1, 2011, Defendants Rod Jones, Ken Hunt, Nate Harley, David Faulkner, William Megenney and Orbelio Rodriguez (the "Individual Defendants") filed the present Motion for Partial Summary Judgment as to Plaintiffs' First Claim for Relief (the "Motion").

Defendant Jones is a former captain with the Department whose promotion to Chief of Police was announced  in or around 2007. (PSGI ¶ 27). Defendant Hunt was, at all relevant times, employed as City Manager for the City of Fontana.[1] (FAC ¶ 6). Defendants Faulkner, Harley, Megenny and Rodriguez were, at all relevant times, captains and lieutenants in the Department. (Id. ¶ 7).

In 2010, Plaintiffs participated in an interview and testing program (the "Sergeant Promotional Program") required in order to become eligible for a promotion to the rank of Sergeant. (Id. ¶ 29). The Sergeant Promotional Program was comprised of three components:

---

[1] Plaintiffs have failed to make any substantive allegations against Defendant Hunt.  As such, it is unclear to the Court why Plaintiffs named Hunt as a Defendant in this case.

(1) a written examination; (2) "internal interviews" conducted by Department employees; and (3) external interviews conducted by persons not employed by the Department. (PSGI ¶¶ 21-24). Defendants Faulkner, Harley, Megenny and Rodriguez (the "Interviewing Defendants") interviewed Plaintiffs during the internal interview portion of the Sergeant Promotional Program. (FAC ¶ 31). Plaintiffs' allegations concern only the internal interview portion of the Sergeant Promotional Program.[2] The Sergeant Promotional Program is discussed in detail, *infra.*

Plaintiffs allege that: (1) the Interviewing Defendants purposefully altered Plaintiffs' interview scores during the 2010 Sergeant Promotional Program in order to prevent Plaintiffs from securing promotions; and (2) Defendant Jones chose to leave two open Sergeant positions unfilled rather than promote Plaintiff Ohler. (FAC ¶¶ 21-27). Plaintiffs allege that Defendants took these actions in retaliation for Plaintiffs exercising their First Amendment rights in their capacity as FPOA representatives. (Id.).

For the reasons set forth in this order, Defendants' Motion for Partial Summary Judgment is GRANTED.

**II. RELEVANT FACTS**[3]

**1. Plaintiffs' Employment with the Department, FPOA Membership**

The facts are undisputed except where noted. Plaintiffs Schlotterbeck and Ohler are City of Fontana Police Department (the

---

[2] The Sergeant Promotional Program is discussed in detail, *infra.*

[3] Defendants Objections to Plaintiffs' Declarations filed in support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment and Plaintiffs' Objections to the Declaration of Defendant Jones address evidence that is not necessary to resolve this Motion. Therefore, the Court does not address them.

"Department") peace officers first hired in 1997 and 2000, respectively. (PSGI ¶¶ 1-2).  In addition, Plaintiffs have held various leadership positions within the FPOA.  (Id. ¶ 3).  Specifically, Plaintiff Ohler held the position of Vice-President and then President in 2006 and 2007, and Plaintiff Schlotterback held the position of Vice-President and then President in 2007 and 2008.  (Id. ¶ 3).

### 2.  Plaintiffs' Allegedly Protected FPOA Activities

Plaintiffs made the following series of disclosures during 2007 and 2008 in their capacity as FPOA representatives.[4]  In late 2007, Plaintiffs claim that they reported to then-Chief of Police Larry Clark and City Manager (and Defendant) Ken Hunt that a Department Lieutenant improperly interfered with an investigation involving a female acquaintance of the Lieutenant.  (Id. ¶ 4).  Specifically, Plaintiffs reported that the Lieutenant prepared a supplemental report that purposefully contradicted a report filed by the investigating officer with the intention that the inconsistencies in the two reports would cause the district attorney to drop charges against the Lieutenant's female acquaintance.  (Id.).

In addition, in or around 2007, Plaintiffs, at the direction of FPOA membership, complained to Police Chief Clark and Defendant Hunt that officers were consistently being punished more harshly than management for identical rules violations.  (Id. ¶ 4).  In the course of this conversation, Plaintiffs referred to a 2003 incident wherein

---

[4] It is unclear whether Plaintiffs' First Amendment Retaliation claim is based solely on their reporting of improper activities within the Department, or whether the claims are also based in part on their membership in the FPOA.  For the purposes of this Motion, the Court considers Plaintiffs' membership in the FPOA as part of the basis for their claim.

the same Lieutenant implicated in the false supplemental report

incident referenced above allegedly received what Plaintiffs believed

to be minimal punishment after being caught engaging in a sexual act in

his Department-issued vehicle.  (<u>Id.</u> ¶ 5).

In or around late 2007, Plaintiffs reported to then-Captain (and

Defendant) Rod Jones that Plaintiffs believed that Defendant Hunt had

illegally promoted a woman in his office with whom he was rumored to be

having an affair.  (<u>Id.</u> ¶ 6).  In addition, Plaintiffs directed the

FPOA attorney to make public records requests to the city for relevant

contacts and emails which resulted in production of contracts by the

City.  (<u>Id.</u> ¶ 6).

### 3. Defendants' Statements to Plaintiffs Regarding Plaintiffs' FPOA Activities

In or around 2007, shortly after the announcement that Defendant

Jones would become the new Chief of Police, Defendant Rodriguez told

Plaintiff Schlotterbeck that he needed to be careful and that his and

Plaintiff Ohler's actions could have offended a lot of people's

promotional plans.  (<u>Id.</u> ¶ 12).

During the tenure of Chief of Police Clark, who preceded Defendant

Jones in that position, Defendant Rodriguez told Plaintiff

Schlotterbeck and others about problems within the department resulting

from Clark's lack of leadership, suggesting that the FPOA should "do

something about it."  (<u>Id.</u> ¶ 15).  In or around  2008, Defendant

Rodriguez told Plaintiffs that their reporting of misconduct to then-

Chief Clark, which resulted in Clark's resignation, prevented Defendant

Rodriguez from securing a promotion.  (<u>Id.</u> ¶ 14). Defendant Jones, who

replaced Clark as Chief of Police, eventually promoted Defendant

Rodriguez from Sergeant to Lieutenant.[5]  (Id. ¶ 16).

Shortly after the 2008 Sergeant Promotional Program, Defendant

Harley told Plaintiff Schlotterbeck that, in order to be promoted,

Plaintiff Schlotterbeck needed to show the Department "that his mind-

set was geared toward the organization and not the POA."  (Id. ¶ 18).

Defendants claim that, in 2009, a Fontana City Council member told

Plaintiff Schlotterbeck that Defendant Hunt did not like the

plaintiffs, but did not state the reason for Defendant Hunt's feelings.

(Id. ¶ 19).  Plaintiffs partially dispute this characterization,

arguing that the City Council member indicated that he did not like

Plaintiffs specifically because of their FPOA activities.  (Id.; Ex. 8,

Schlotterbeck Decl. ¶ 21).

### 4. The 2010 Sergeant Promotional Program

In order to be become eligible for a promotion to the rank of

Sergeant, Fontana Police Officers must participate in a three-part

promotional process organized and administered by the Human Resources

("HR") Department consisting of three parts.  (Id. ¶¶ 21-24).  First,

each applicant takes a 125-question multiple choice exam comprising ten

per cent of each applicant's total score.  Second, each applicant is

interviewed by an "internal" interview panel comprised of five

employees of the Department.  Finally, each applicant is interviewed by

an "external" interview panel comprised of individuals not employed by

[5] It is undisputed that, on or around January 2008, a Sergeant Green told Plaintiffs that they had ruined his career with their "gangster-like tactics."  (Id. ¶ 10).  However, Plaintiffs did not name Sergeant Green as a Defendant nor did they allege that he had any involvement whatsoever in any allegedly adverse employment action. Accordingly, this fact is of no consequence.

the Department. The internal and external interview scores are each worth forty-five per cent of an applicant's total score. (Id.). The 2010 written text and external interviews were not biased against Plaintiffs.[6] (Id. ¶ 30).

The 2010 Sergeant Promotional Program internal interviews were conducted as follows. Applicants answered four identical predetermined questions and then had the opportunity to provide a closing statement. (Id. ¶ 22). Five internal interviewers gave the applicants scores in five categories, for a maximum total score of one hundred points. (Id.). A Human Resources employee totaled the scores outside the presence of the interviewers, eliminated the highest and lowest score, and calculated each applicant's average score. (Id.). The eligibility list created by the Sergeant Promotional Program remains valid for one year. (Id. ¶ 26). The Chief of Police (with approval from Human Resources) typically fills available Sergeant positions by selecting the highest scoring candidate not yet promoted. (Id.).

Plaintiffs participated in the 2010 Sergeant Promotional Program. (Id. ¶ 29). Out of thirteen total applicants, Plaintiff Ohler finished third overall, and Plaintiff Schlotterbeck finished sixth.[7] (Id.).

---

[6] Plaintiffs Ohler and Schlotterbeck also participated in the Sergeant Promotional Program in 2008, placing ninth and tenth out of eleven applicants, respectively. (PSGI ¶ 27). It is curious that Plaintiffs made no First Amendment Retaliation claim regarding their placement in the 2008 Sergeant Promotional Program even though key disclosures that Plaintiffs claim are the basis for this action were made prior to the 2008 Sergeant Promotional Program. It is further noted that, while Plaintiffs placed ninth and tenth out of eleven participants in the 2008 Sergeant Promotional Program, Plaintiffs placed third and sixth out of thirteen participants in the 2010 Sergeant Promotional Program.

[7] Plaintiffs do not dispute these results, but do dispute the "legitimacy or accuracy of the scoring process" that produced these

Defendants Harley, Falkner, Megenny and Rodriguez and an additional
unnamed Sergeant (the "internal interview panel") conducted the 2010
internal interviews.[8]  (Id. ¶ 31).  Pursuant to his practice of filling
vacant positions in the order set forth in the eligibility list,
Defendant Jones filled two sergeant positions that opened in 2010 with
the first two persons on the 2010 eligibility list.  (Id. ¶ 35).
Plaintiff Ohler, as the third person on the eligibility list, was first
in line to receive a promotion when the eligibility list expired on
February 8, 2011.[9]  (Id. ¶ 36).

### 5.  Additional Facts Alleged by Plaintiffs Regarding Defendant Rodriguez

Plaintiffs make several additional allegations regarding Defendant
Rodriguez.  Specifically, Plaintiffs allege that, at a January 2008
SWAT team meeting, Defendant Rodriguez spoke, indicating his
disappointment that Defendant Jones had been promoted to Chief of
Police.  (Id. ¶ 55).  Plaintiffs allege that, during the meeting,
"Rodriguez stared at Ohler, making him feel uncomfortable."  (Id. ¶
55).  Plaintiffs further allege that, in a discussion after the
meeting, Defendant Rodriguez explained that certain members of the
Department had created a line of succession designed to ensure that
specific officers would be promoted to various positions within the

---

results.  (PSGI ¶ 29).

[8] The parties agree that the external interviews and written portions
of the examination were conducted fairly.  Accordingly, only the
internal interviews portion of the exam is in dispute.

[9] Plaintiffs filed suit on December 22, 2010, at which point the
eligibility list was still viable.  However, the eligibility list,
which expired on February 8, 2011, is currently of no effect.

Department, and that the removal of former Chief of Police Clark and the unexpected promotion of Defendant Jones to Chief of Police "ruined these plans." (Id. ¶ 56).  In addition, Plaintiffs allege that, in or around January 2008, Defendant Rodriguez was overheard expressing anger at the FPOA Board, indicating that the FPOA Board was "out of line." (Id. ¶ 57).  Finally, Plaintiffs claim that, in mid-2010, Defendant Rodriguez remarked to Plaintiffs that he was a "vengeful fucker" and that he would "always get somebody back" who had angered him.  (Id. ¶ 62).

### 6.  Additional Facts Alleged by Plaintiff regarding a Corporal Kraut

Plaintiffs make various allegations regarding a Corporal Kraut, who participated in the 2010 Sergeant Promotional Program, placing second and eventually securing a promotion to Sergeant.  (PSUF ¶¶ 71-77; Exs. 5,6).  Specifically, Plaintiffs claim that: (1) both Kraut and his wife asked a Corporal Reed[10], who was scheduled to have the first internal interview during the Sergeant Promotional Program, to immediately provide Kraut with the interview questions after Reed's interview; and (2) the scoring of Kraut's application was inaccurate.[11]  (PSUF ¶¶ 71-77).

---

[10] Plaintiffs provide no information regarding where Corporal Reed placed in the Sergeant Promotional Program.  However, Officer Zagorin finished first, one place ahead of Corporal Kraut.  (Ex. A).

[11] Plaintiffs' claims regarding Corporal Kraut are contradicted in part by Corporal Reed's deposition testimony.  Corporal Reed confirms that Corporal Kraut's wife placed a phone call prior to Reed's interview asking Reed to tell Kraut what questions were asked during both the internal and external interviews prior to Kraut's examination.  (Reed Depo. 11:17-12:12).  However, Corporal Reed also testified that, while Corporal Kraut did call Reed after Reed's interview, Kraut did not request information regarding the specific interview questions posed during Reed's interview or the general

**III. SUMMARY JUDGMENT LEGAL STANDARD**

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Tarin v. County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex Corp v. Catrett, 477 U.S. 317, 323-24 (1986). The moving party may satisfy its Rule 56(c) burden by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. See id. at 323-24; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000). Only genuine disputes "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party" over facts that might affect the outcome of the suit

---

topics covered, nor did Reed provide such information to Kraut. (Id. 13:13-14:8).
    Furthermore, Plaintiffs have provided no evidence supporting their contention that Kraut's application was scored inaccurately. In addition, Plaintiffs have provided no evidence that they were better qualified than Corporal Kraut for a promotion to Sergeant other than unsupported speculation that Corporal Kraut received an extra point in a sub-category of his internal interview score.

under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248.

Under Local Rules 56-2 and 56-3, these triable issues must be identified in the non-moving party's "Statement of Genuine Issues" and supported by "declaration or other written evidence." See Sullivan v. Dollar Tree Stores, Inc., 623 F.3d 770, 779 (9th Cir. 2010) ("Federal Rule of Civil Procedure 56(e)(2) requires a party to "set out specific facts showing a genuine issue for trial.") If the non-moving party fails to identify the triable issues of fact, the court must treat the moving party's evidence as uncontroverted. Local Rule 56-3; see also International Longshoremen's Ass'n, AFL-CIO v. Davis, 476 U.S. 380, 398 n.14 (1986) ("[I]t is not [the Court's] task sua sponte to search the record for evidence to support the [parties'] claim[s].")"; Carmen v. San Francisco United School District, 237 F.3d 1026, 1029 (9th Cir. 2001) ("A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence.").

**IV.  DISCUSSION**

"It is well settled that the state may not abuse its position as an employer to stifle the First Amendment rights its employees would otherwise enjoy as citizens to comment on matters of public concern." Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (internal quotation marks omitted)).  The Supreme Court has explained that "the problem in any case is to arrive at a balance between the interests of the [public

employee] as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employers." Pickering v. Board of Ed. of Township High Sch. Dist. 205, 391 U.S. 563, 568 (1968).

In striking this balance, the Ninth Circuit recently articulated a five-step test for evaluating First Amendment retaliation claims.    The court must address the following five inquiries in sequence:   (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen rather than a public employee;[12] (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.   Eng, 552 F.3d at 1070.  The first three elements make up the plaintiff's prima facie case; thus, the plaintiff bears the burden of proof on these elements.   Id. at 1070-71.  If these elements are satisfied, the burden then shifts to the employer to establish _either_ that the employer's legitimate administrative interests outweigh the employee's First Amendment rights (the fourth prong), or alternatively, that the employer would have taken the adverse employment action even in the absence of the protected speech (the fifth prong).   Id. at 1071-72.

---

[12] Defendants make no argument on the second element of Plaintiffs' prima facie case.

### A.   Matter of Public Concern

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" Enq, 552 F.3d at 1070 (quoting Johnson v. Multnomah County, Or., 48 F.3d 420, 422 (9th Cir. 1995)).  Speech that "is 'relevant to the public's evaluation of the performance of governmental agencies'" or "communications on matters relating to the functioning of government" are matters of inherent public concern.  Id. at 1073 (quoting Freitag v. Ayers, 468 F.3d 528, 545 (9th Cir. 2006)); Johnson, 48 F.3d at 425.  Alternatively, "[s]peech by public employees may be characterized as not of public concern when it 'deals with individual personnel disputes and grievances' and when that information 'would be of no relevance to the public's evaluation of the performance of governmental agencies.'"  Roe v. City & County of San Francisco, 109 F.3d 578, 585 (9th Cir. 1997) (Internal citation omitted).  To determine whether an employee's speech addresses a matter of public concern, the court must look to the content, form, and context of a given statement.  Id.  This inquiry is purely a question of law.  Id.

Defendants argue that Plaintiffs' speech was not on a matter of public concern because Plaintiffs' complaints and reports amounted to complaints about perceived unfairness in personnel decisions.  (Motion for Partial Summary Judgment, hereinafter "MSJ", at 16:18-18:17).  As noted above, Plaintiffs' speech consisted of: (1) complaints that rank and file officers were punished more severely for identical offenses as compared to management; (2) reporting to Defendant Jones that there was a rumor that Defendant Hunt had wrongfully promoted a woman in his office with whom he was having an affair; (3) various problems related

to the Narcotics Unit alleging a lack of supervision.  In addition,
Plaintiffs claim to have reported incidents including allegations that:
(1) a Lieutenant engaged in a sexual act in his Department-issued
vehicle; and (2) that same Lieutenant filed a supplemental report that
contradicted the investigating officer's report in order to ensure that
charges against a female acquaintance were improperly dropped.

Defendants argue that  Desrochers v. City of San Francisco, 572
F.3d 703, 711 (9th Cir. 2009) controls.  While the Court finds the
analysis in Desrochers persuasive, the Court finds that the present
case is factually distinguishable. The plaintiffs in Desrochers were
two San Bernadino, California police officers who were subject to
adverse employment actions in the form of an unwanted transfer, an
internal affairs investigation, and a two-week suspension.  Id. at 705.
Plaintiffs argued that the defendants took these adverse actions in
retaliation for plaintiffs' allegedly protected speech.  Id. at 708.
Plaintiffs had lodged a series of complaints regarding the management
style of a Lieutenant Kimball, criticizing Kimball as an "autocratic,
controlling and critical supervisor" and describing him as a micro-
manager who insults his fellow officers.  Id. at 705-06.

Plaintiffs argued that their complaints involved a matter of
public concern because such complaints "necessarily implicat[e] issues
such as the competency, preparedness, efficiency, and morale of the"
San Bernadino Police Department.  Id. at 710; see also McKinley v. City
of Eloy,  705 F.2d 1110, 1114 (9th Cir. 1983) (stating that "the
competency of the police force is surely a matter of great public
concern" as a matter of law).  The Court rejected this argument, noting
that (1) the "plain language" of plaintiffs' complaints did not

"directly address" police competence, but rather "indicate[d] that [plaintiffs] were involved in a personality dispute centered on Kimball's management style;" and (2) plaintiffs did not "alleged that anyone failed to do his job, or even that someone did his job poorly." Id. at 712.   Therefore, because the "essence" of plaintiff's speech was dissatisfaction with a supervisor's management style, the Court reasoned that the content of plaintiffs' speech related "at best only tangentially" to matters of public concern.   Id. at 714.

In contrast, construing the facts in the light most favorable to the non-moving party, the Court concludes that Plaintiffs Ohler and Schlotterbeck's alleged disclosures involved more than a purely internal workplace grievance.   Plaintiffs made disclosures involving actions conducted by high-ranking Department officials that potentially violated Department policy as well as state law.   As noted above, Plaintiffs claim to have reported allegations that: (1) a police officer engaged in a sexual act in his Department-issued vehicle; and (2) the same officer filed a contradictory supplemental report in order to ensure that charges against a female acquaintance were improperly dropped.   Clearly such allegations stand in stark contrast to charges that one's supervisor is a "micro-manager."   Furthermore, allegations of such egregious police misconduct surely touch upon the "competency of the police force," as well as concerns "about the preparedness of a vital public-safety institution."   McKinley, 705 F.2d at 1114; Gilbrook v. City of Westminster, 177 F.3d 839, 866 (9th Cir. 1999); see also, Thomas v. City of Beaverton, 379 F.3d 802, 809 (9th Cir. 2004) ("Unlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern.").   Phrased another

way, such allegations "can fairly be considered to relate to 'any
matter of political, social, or other concern to the community,'" and
are '"relevant to the public's evaluation of the performance of
governmental agencies." <u>Eng</u>, 552 F.3d at 1073 (Internal citation
omitted).  Accordingly the Court concludes that Plaintiffs' speech
involved a matter of public concern.[13]

> **B.   Whether Plaintiff's Speech Was a Motivating Factor in
> the Adverse Employment Decision**

Plaintiffs bear the burden of showing that Defendants took an
adverse employment action against them and that Plaintiffs' speech was
a substantial or motivating factor in the adverse decision.  The court
"must consider the full range of adverse employment actions alleged in
the complaint." <u>Eng</u>, 552 F.3d at 1073.[14]

---

[13] The Court acknowledges that the fact that Plaintiffs communicated
their grievances to a small audience weighs against a finding that
the disclosures involved a matter of public concern.  <u>See</u> <u>Desrochers</u>,
572 F.3d at 714 (quoting <u>Roe</u>, 109 F.3d at 585) (reasoning that
"limited audience weigh[s] against [a] claim of protected speech").
Likewise, the Court recognizes that it appears that Plaintiffs'
primary motivation in making the allegedly protected disclosures was
an ongoing workplace grievance also weighs against a finding that
Plaintiffs' speech involved a matter of public concern.  <u>See</u>, <u>e.g.</u>
<u>Havekost v. U.S. Dept. of Navy</u>, 925 F.2d 316, 318 (9th Cir. 1991)
("One critical inquiry is whether the employee spoke in order to
bring wrongdoing to light or merely to further some purely private
interest.").  However, for the reasons set forth above, the Court
concludes that Plaintiffs' speech did involve a matter of public
concern.

[14] In their Opposition, Plaintiffs discuss at length allegations of
manipulation of test scores used to determine which officers would be
assigned to the Special Enforcement Team in an attempt to establish
that the Department "has an express policy" of generally manipulating
test scores in order to ensure that specific officers received
specific assignments.  (Opposition 19:19-21).  Plaintiff never
participated in the Special Enforcement Team interview process, thus
they lack any firsthand knowledge regarding the truth of these
allegations.  Furthermore, none of these allegations involve the
Defendants.  Accordingly, the Court agrees with Defendants that such

### 1. Defendants' Awareness of Plaintiffs' Protected Disclosures

While the Interviewing Defendants all concede in their declarations that they were aware of Plaintiffs' involvement with the FPOA, at no point has Plaintiff presented evidence that the Interviewing Defendants were aware of the specific disclosures which were the basis for the alleged retaliatory actions.  As Defendants note, Plaintiffs' disclosures were directed to former Police Chief Clarke, a few City Council Members, the City's H.R. Director, and Defendant Hunt, who did not participate in the Sergeant Promotional Program.  At no point do Plaintiffs allege that disclosures were made to any of the Defendants who actually participated in the "internal" interviews, or that those Defendants were aware of the specific disclosures at issue.

However, assuming that Defendants were aware of Plaintiffs' specific disclosures, Plaintiffs bear the burden of establishing more than "mere knowledge" of the speech at issue.  See Keyser v. Sacramento City Unified School Dist., 265 F.3d 741 (9th Cir 2001) (Plaintiffs' production of evidence that Defendant, deputy superintendent of a school district,  knew of Plaintiffs' complaints that Defendant had misused public funds did "not create a genuine issue of material fact on the question of whether [Defendant's] decision to recommend [Plaintiffs'] reassignment was motivated by [Plaintiffs'] charges);

accusations have little, if any, relevance to the question of whether the Defendants in this case retaliated against Plaintiffs for exercising their First Amendment rights by denying them a promotion pursuant to the Sergeant Promotional Program in 2010.  Further, even if these allegations were relevant, Plaintiffs have not supported these allegations with admissible evidence.

Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 685 (1996) ("To prevail, [Plaintiff] must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized the Board members before they terminated him."); Gillette v. Delmore, 886 F.2d 1194, 1199 (9th Cir. 1989) (granting partial summary judgment against Plaintiff employee, reasoning that Plaintiff's claim that employer was aware of his political activities was insufficient to meet his burden in opposing summary judgment because Plaintiff had shown no link between his political activities and his termination).

In order to create a genuine issue of material fact, Plaintiffs must produce evidence of at least one of three types: (1) additional evidence demonstrating that the "proximity in time between the protected action and the allegedly retaliatory employment decision" was one in which a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech;" (2) evidence that Plaintiff's employer expressed opposition to his speech, either to him or to others; or (3) evidence that Plaintiff's employer's proffered explanations for the adverse employment action were false and pretextual.  Keyser, 265 F.3d at 751-52.

### a.    Proximity in Time

First, while Plaintiffs' allegedly protected speech occurred in 2007 and 2008, the allegedly adverse employment action occurred in 2010.  In Erickson v. Pierce County, 960 F.2d 801, 803 (9th Cir. 1992), the Court granted an employer judgment notwithstanding the verdict where the relevant time-frame was a mere three months.  In the instant

case, there was at least a two-year gap between Plaintiffs' alleged disclosures and the alleged retaliatory action by Defendants. Accordingly, the Court concludes that Plaintiffs have not produced sufficient proximity evidence to create a genuine issue of material fact. See also, Keyser, 265 F.3d at 752 (reasoning that a two year gap between the date when defendant learned of plaintiff's protected speech and the date of an adverse employment action was far too long to support an inference of retaliatory motive in light of Erickson) (citing Erikcson, 960 F.2d at 803).

### b. Whether Defendants Expressed Opposition to Plaintiffs' Protected Disclosures

Plaintiffs have produced evidence that could establish that at least some of the Individual Defendants expressed opposition to Plaintiffs' allegedly protected speech. Plaintiffs refer to: (1) comments by Defendant Rodriguez warning Plaintiffs to "be careful" because some Department employees might be upset at Plaintiffs for interfering with their promotional plans; (2) comments by Defendant Rodriguez claiming that Plaintiffs' FPOA activities would prevent him from being promoted to Lieutenant (a promotion Rodriguez subsequently received); and (3) a comment by Defendant Harley to Plaintiff Schlotterbeck that, in order to secure a promotion, Plaintiff Schlotterbeck needed to show the Department that he was geared towards the organization, and not the FPOA. The Court will assume, for the purposes of Defendants' Motion, that these statements could be construed as opposition to Plaintiffs' speech.[15] However, as this Order

---

[15] The Court makes this assumption notwithstanding the fact that Defendants' statements were made at least two years prior to the alleged retaliatory employment action

thoroughly explains, even assuming that at least some of the Interviewing Defendants expressed opposition to Plaintiffs' speech, Plaintiffs have not produced any evidence that establishes that such opposition in any way affected the scores given to Plaintiffs by the Interviewing Defendants, or how the scores given to Plaintiffs by the Interviewing Defendants affected Plaintiffs' overall scores.

### c. False or Pretextual Explanations; Plaintiffs' Claims Against Defendant Jones

Plaintiffs have produced no evidence that Defendants' proffered explanations for the adverse employment action were false and pretextual. Plaintiffs allege that, contrary to past practice, Defendant Jones chose not to fill two vacant Sergeant positions in order to avoid promoting Plaintiffs. This allegation, wholly unsupported by any evidence, also ignores the fact that Plaintiff Schlotterbeck, who was sixth on the eligibility last pursuant to the 2010 Sergeant Promotional Program, would not have received a promotion even had Defendant Jones filled the vacancies at issue. Therefore, it appears that only Plaintiff Ohler could even allege any retaliatory action against Defendant Jones because Plaintiff Ohler, who finished third overall, and thus was next in line to be promoted after Defendant Jones filled two vacancies with the first two names on the eligibility list.[16]

---

[16] As noted above, Plaintiffs claim that Sergeant vacancies were customarily filled by promoting the highest scoring candidate not yet promoted. Therefore, even if Defendant Jones had filled all four Sergeant positions that became vacant during the time that the eligibility list was valid, Plaintiff Schlotterbeck still would not have been promoted. Accordingly, it appears that Plaintiff Schlotterbeck's allegations relate only to the Interviewing Defendants. In short, Plaintiff Schlotterbeck alleges that his Sergeant Promotional Program scores were manipulated, resulting in a

However, Defendants offer a valid non-pretextual explanation for the decision not to fill the vacancies: the City of Fontana's undisputed financial difficulties.  This explanation, beside being eminently reasonable, is supported by the declaration of Annette Henckel, Fontana's  Director of Human Resources.[17]  Furthermore, Plaintiffs have offered no admissible evidence to contradict Hanckel's declaration regarding the city's financial difficulties and the resulting lay-offs.  Accordingly, the Court concludes that no reasonable jury could find beyond speculation that the decision not to fill two vacant Sergeant positions rested on a false or pretextual basis.

**2.   Allegations Regarding Defendant Rodriguez**

As noted above, Plaintiffs have presented evidence of statements made by Defendant Rodriguez regarding Plaintiffs' FPOA activities.  It appears from the record before the Court that most of Defendant Rodriguez's statements involved his concerns regarding how Plaintiffs' disclosures might have affected changes in leadership within the Department, as well as how those changes might have affected Defendant

lower placement on the eligibility list than he actually deserved. There is no allegation that Defendant Jones had any direct involvement in the internal interview process.  Accordingly, the Court addresses the allegations against Defendant Jones only in terms of how Jones' actions allegedly affected Plaintiff Ohler.

[17] Specifically, in her Declaration, Ms. Henckel notes that the City of Fontana has experienced financial difficulties since 2009 and that, as a result, "[t]he City has reduced approximately 70 filled and vacant positions and is currently in the process of doing additional layoffs.  Accordingly, "Police Chief Jones' decision not to fill the current Sergeant vacancies is consistent with the decisions made by all City departments to save money on personnel costs." (Henckel Decl. ¶ 18).

Rodriguez's career.  Nevertheless, while Plaintiffs have failed to
produce evidence that Defendant Rodriguez expressed opposition to the
specific disclosures at issue, it is clear that Defendant Rodriguez
was, at a minimum, critical of Plaintiffs' FPOA activities.
Accordingly, the Court cannot assume a complete absence of retaliatory
motive on the part of Defendant Rodriguez.  However, even assuming that
Defendant Rodriguez held such a bias against Plaintiffs, Plaintiffs
have failed to meet their burden to show that Defendant Rodrigeuz's
bias was a substantial or motivating factor in an adverse employment
action.

Plaintiffs have produced no evidence suggesting that any bias that
Defendant Rodriguez might have had against Plaintiffs in any way
affected the internal interview scores that he gave to Plaintiffs.  To
illustrate, Plaintiffs have presented no evidence suggesting that
Defendant Rodriguez gave the Plaintiffs lower scores than did any of
the other Interviewing Defendants, or the unnamed fifth member of the
internal interview panel.  Additionally, because the record contains
only the numbers assigned to each internal interviewer (as opposed to
the name of each internal interviewer), the Court has no means of
determining the specific scores given to any of the applicants by any
specific member of the internal interview panel.  Furthermore, it is
undisputed that the highest and lowest score given to each applicant
during the internal interview process was not considered in calculating
each applicant's final internal interview score.  Plaintiffs have
wholly failed to account for how Defendant Rodriguez (or any other
Defendant, for that matter) could have successfully manipulated
Plaintiffs' scores in light of the fact that the lowest score for each
applicant would automatically be dropped.  Moreover, Plaintiffs have

not alleged any undue influence on the fifth unnamed member of the
interview panel, let alone alleged that Defendant Rodriguez
specifically influenced the fifth panel member based on Rodriguez's
alleged desire to retaliate against Plaintiffs on the basis of their
protected disclosures.  Finally, even were the Court to assume that
there was some irregularity with regards to the internal interviews,
Plaintiffs have offered no evidence of how Plaintiffs' internal
interview scores affected their overall scores.

### 3.    Allegations Regarding Defendant Harley

It is undisputed that, shortly after the 2008 Sergeant Promotional
Program, Defendant Harley told Plaintiff Schlotterbeck that, in order
to be promoted, Plaintiff Schlotterbeck needed to show the department
"that his mind-set was geared toward the organization and not the POA."
The Court concludes that one stray remark, two years prior to the
allegedly adverse employment action, is insufficient to support the
inference of retaliation required by Plaintiffs' theory.  As with
Defendant Rodriguez, Plaintiffs have offered no evidence of how
Defendant Harley scored Plaintiffs' internal interviews, or how he
might have influenced the scores of other members of the internal
interview panel.  Accordingly,  the Court concludes that Plaintiffs
have failed to meet their burden to establish that any retaliatory
motive on the part of Defendant Harley was a substantial or motivating
factor in an adverse employment action.

### 4.    Ability of the Interviewing Defendants to Affect Plaintiffs' Overall Scores

Aside from not meeting their evidentiary burden, Plaintiffs have
advanced a theory of their case that is convoluted and facially

implausible.   It is undisputed that: (1) the internal interviews accounted for only forty-five per cent of each applicant's score; (2) both the written exam and external interviews, which together account for fifty-five per cen of each applicant's score, were conducted fairly, without any bias against Plaintiffs and (3) the external interviews took place *after* the internal interviews.   Plaintiffs have not alleged that the Interviewing Defendants were made aware of each applicant's score on the written exam prior to the internal interviews. The Interviewing Defendants could not have known Plaintiffs' external interview scores when they allegedly manipulated those scores because the internal interview preceded the external interviews.   Furthermore, Plaintiffs have made no allegations of collusion with HR Department employees to change Plaintiffs' scores after the completion of the external interviews, at which point Defendants would have had enough information to determine exactly how much manipulation of Plaintiffs' scores would have been necessary to produce the desired result.   In addition, Plaintiffs have not produced any evidence suggesting that they could have known how many Sergeant positions would open up during the following year. Finally, as noted above, the internal interview panel included a fifth unnamed member against whom Plaintiffs have made no allegations of retaliation.   Accordingly, the Court concludes that Plaintiff have offered no evidence beyond speculation and unsupported conclusion that would allow a reasonable jury to find that Plaintiffs' protected disclosures were a substantial or motivating factor in Defendants' allegedly adverse employment action.

## V.   Plaintiffs' Claims Against Defendant The City of Fontana

Plaintiffs have named Defendant City of Fontana in their § 1983 claim.  A municipality can be liable under § 1983 if the municipality itself has caused a constitutional deprivation. Monell v. Dep't of Soc. Servs. , 436 U.S. 658 (1978). However, a municipality is only liable if the plaintiff suffers a constitutional violation. Villegas v. Gilroy Garlic Festival Ass'n , 541 F.3d 950, 957 (9th Cir. 2008) (citing City of Canton v. Harris , 489 U.S. 378, 385 (1989); Monell , 436 U.S. at 690-91)).

On May 3, 2011, the Court issued an Order staying Plaintiff's _Monell_ and State law claims.  Because the Court has determined that there were no constitutional violations in this case, the Court hereby lifts the stay and GRANTS Defendant City of Fontana's Motion to Dismiss as to Plaintiff's first claim.

Plaintiffs' Second is based entirely on state law. "This Court has the duty to consider subject matter jurisdiction sua sponte in every case, whether the issue is raised by the parties or not." See Spencer Enterprises, Inc. v. United States , 345 F.3d 683, 687 (9th Cir. 2003).  Accordingly, because there are no longer any federal claims in this case that would vest this Court with subject matter jurisdiction, the Court hereby DISMISSES Plaintiffs' Second Claim without prejudice.

**VI.   CONCLUSION**

    For the reasons set forth in this order, Defendants' Motion is hereby GRANTED.  Furthermore, Plaintiff's First and Second claims against Defendant City of Fontana are hereby DISMISSED without prejudice.

    IT IS SO ORDERED.

DATED: September 14, 2011

                           STEPHEN V. WILSON

                  UNITED STATES DISTRICT JUDGE